**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **YOLANDA J. FAULK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 3:08-CV-0591-SLB** |
| | ) | |
| **VOLUNTEERS OF AMERICA,** | ) | |
| **NORTH ALABAMA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

This case is presently pending before the court on defendant's Motion for Summary Judgment, (doc. 41),[1] Amended Motion for Summary Judgment, (doc. 61), and Motion to Strike, (doc. 78).   Plaintiff Yolanda Faulk has sued her former employer, defendant Volunteers of America, North Alabama, Inc., alleging that defendant discriminated against her on the basis of her race, age, and religion and that it retaliated against her for complaining about discrimination, in violation of federal law.   Plaintiff also alleges state-law causes of action for age discrimination and "negligent and/or wanton hiring, training, supervision, and retention."  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 41), is due to be denied as moot; its Amended Motion for

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

Summary Judgment, (doc.61), is due to be granted, and its Motion to Strike is due to be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the non-moving party "need not be given the benefit of every

inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988))(emphasis added).

## II.  SUMMARY JUDGMENT FACTS[2]

### A.  PLAINTIFF'S DECLARATION

Plaintiff's deposition testimony, (doc. 45, Ex. 1), provides one version of her allegations of discrimination, and her Declaration filed, (doc. 67, Ex. A), provides another. Where the two conflict, the court has relied upon plaintiff's deposition testimony. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 n. 7 (11th Cir. 2003) (court "may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."); *see also Thomas v. Ala. Council on Human Relations, Inc.*, 248 F. Supp.2d 1105 (M.D. Ala. 2003) ("[P]ortions of affidavits which are clearly inconsistent with prior deposition testimony are due to be stricken.").

Defendant's Motion to Strike plaintiff's Declaration is due to be granted to the extent her Declaration conflicts with her deposition testimony.

_____

[2]As required when determining a motion for summary judgment, the court has construed the facts in the light most favorable to plaintiff, the non-moving party. All disputed facts are resolved in her favor, and all reasonable inferences arising from those facts are drawn in her favor. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

## B.  PLAINTIFF GETS HIRED

Defendant operates group homes to serve the needs of developmentally-challenged adults and adolescents in and around Florence, Alabama.  (Doc. 45, Ex. 1 at 60, 108 and ex. B at 5.)  Plaintiff began working for defendant as a House Manager I on February 23, 2007. (*Id*. at 49, 52, 107-08.)  She has a bachelor's degree in social work from the University of North Alabama, and she has taken graduate level courses at the University of Central Oklahoma and Pfeiffer University in "adult education, gerontology, and 'Godly Play.'"  (*Id*. at 52 and ex. D at 000046; doc. 67, Ex. A at 1.)

Defendant hired plaintiff to work the weekend shift, which was sixteen hours a day on Saturday and Sunday.  (Doc. 45, Ex. 1 at 106, 116.)  Plaintiff indicated on her application that she "didn't mind working weekends."  (*Id*. at 117 and ex. D at 000044.)  When she was hired and again on April 10, 2007, Brandy Springer, Services Coordinator and her supervisor, told her that she "would only [be] working for a little while on the weekends and that after a while [she] would be able to work just Monday through Friday."  (*Id*. at 14, 115-17.)

## C.  COMPANY POLICIES

Plaintiff received a copy of defendant's Personnel Policies when she began work.  (*Id*. at 125 and ex. B at 1; doc. 63, Ex. 4A.)  It contains, among other things, defendant's Equal Employment Opportunity ("EEO") policy, Productive Work Environment ("PWE") policy, and Grievance Procedure.   (Doc. 45, Ex. 1, ex. B at 8, 27-29, 36-37.)

Defendant's EEO policy provides that employees are to be "treated fairly during employment without regard to their race, creed, color, age, religion, sex, national origin, or disability." (Doc. 45, Ex. 1(B), p. 8.)  The policy requires "all personnel actions" to be "administered without regard to race, creed, color, age, religion, gender, national origin, or disability." (Doc. 45, Ex. 1(B), p. 8.)

Defendant's PWE policy provides:

It is the policy of VOANA, INC. that it will not tolerate verbal or physical conduct by any employee that harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile environment.

All employees have the right to a work environment free from intimidation and harassment.  This company prohibits any physical, verbal, or visual harassment of any employee.

. . .

B.      Each supervisor has a responsibility to maintain a work place that is free of any form of harassment.  Harassment includes, but is not limited to:

1.      Verbal abuse of a racial or national origin nature.
2.      Slurs or epithets about an individual's race or national origin.
3.      Jokes that belittle or make fun of an individual's race or national origin.
4.      Distribution of literature or material that is degrading to any race or national origin.

C.      Any employee who believes that the actions or words of a supervisor or fellow employee constitute unwelcome harassment has a responsibility to report or complain as soon as possible to their supervisor and/or to the Human Resources Department or CEO.

5

D.    All complaints of harassment will be investigated promptly as directed by the CEO with an emphasis upon complete impartiality and confidentiality.  In all cases, the employee is to be advised of the management's findings and conclusion.

E.    Any employee, supervisor, or manager who is found after appropriate investigation to have engaged in harassment of another employee will be subject to appropriate disciplinary action, depending on the circumstances, up to and including termination.

(Doc. 67, Ex. 1, ex. B at 36-37.)

Defendant's Grievance Procedure applies to persons who believe they have not been treated fairly with respect to personnel actions, working conditions, or supervision.  (Doc. 45, Ex. 1, ex. B at 27.)  It provides that an employee may initiate a grievance after attempting to address a problem with her immediate supervisor through a problem-solving conference. (*Id*. at 27-28.)  The employee may bypass meeting with any supervisor who is the subject of the employee's complaint.  (*Id*. at 28.)  An employee who is not satisfied with the outcome of the problem-solving conference may then file a written grievance to the CEO, who will then appoint a committee to address the grievance.  (*Id*.)

At numerous points in her deposition, plaintiff claims that defendant and its employees failed to follow these policies, which offended her.  (*E.g.*, doc. 45, Ex. 1 at 75-77, 123-27.)  While she has not testified that anything written into the policy is itself offensive or discriminatory, she believes defendant – particularly Tucker, its CEO – wrongfully failed to train and supervise its employees to ensure that they followed defendant's policies.  (*Id*. at 90-92.)

6

### D.  PLAINTIFF GOES TO WORK

As part of her job as a House Manager I, plaintiff was required to have certain personality characteristics, such as tolerance, patience, consistency, flexibility, and creativity. (*Id*. at 108-09 and ex. D at 000051.)  The principal activity of a House Manager I was to develop and maintain positive relationships with clients, co-workers, families, case managers, and employees of other agencies. (*Id*. at 110.)  Plaintiff understood and accepted her job responsibilities. (*Id*. at 111.)

Melissa Castle, a House Manager II, oversaw the group homes in which plaintiff worked. (*Id*. at 52, 111.)  Springer directly supervised both plaintiff and Castle. (*Id*. at 111-12.)  Stephenson was Springer's immediate supervisor. (*Id*. at 112-13).  Stephenson reported to Tucker, defendant's CEO. (*Id*. at 113.)  Sara Rickard provided training, although her job title is unclear from the record. (*Id*. at 14, 113.)  Rickard did not supervise plaintiff. (*Id*. at 14.)

Plaintiff alleges that Tucker, Rickard, Stephenson, Springer, Castle, and Robin Bucklin, a Recruiter in the Human Resources Department, discriminated against her on the basis of her race, age, and/or and religion. (*Id*. at 13; doc. 63, Ex. 5 ¶ 2.)  She alleges that all or some of these individuals comprised a management clique that conspired and/or was trained to discriminate against African-Americans. (Doc. 45, Ex. 1 at 33-34.)  Essentially, plaintiff claims that discrimination against minorities was the custom or practice of the

management clique.  (*Id*. at 33-37.)  Plaintiff testified that she believes defendant "thinks that black people are slaves on [its] plantation."  (*Id*. at 46.)

### 1. Victor Tucker

Plaintiff alleges that Tucker "hired [her] and then put [her] in a position where [she] wasn't able to move up."  (Doc. 45, Ex. 1 at 17.)  She also alleges that he hired "those white girls over [her]."  (*Id*. at 17, 19.)  However, plaintiff admits the "white girls" were working for defendant when she was hired.  (*Id*. at 19.)  She further alleges that Tucker did not enforce defendant's Personnel Policies or properly train defendant's staff properly because he "allowed [her] termination to take place" and "allowed the staff . . . to discriminate" against her on the basis of race.  (*Id*. at 17, 20, 67.)[3]

Plaintiff never saw or talked to Tucker.  (*Id*. at 18.)  He never talked to her directly. (*Id*. at 19, 157.)  Plaintiff never told Tucker that she felt she had been mistreated based on her race, age, and/or religion, although she tried to contact him on a number of occasions.  (*Id*. at 157.)   She left messages for him on his voice mail or with Bucklin, but he did not return her calls.  (*Id*. at 20-23, 153.)  Plaintiff testified she could not recall whether she mentioned discrimination or harassment in any of these messages, which she started leaving

_____

[3]Defense counsel asked plaintiff during her deposition if these were all of the incidents of discrimination by Tucker, and she responded that these incidents were the only ones she could remember at the time.  (Doc. 45, Ex. 1 at 24.)

soon after she began to work for defendant.  (*Id*. at 22-23, 157.)  She never submitted any

type of written complaint or grievance to Tucker.  (*Id*. at 23.)

### 2.  Sara Rickard

Plaintiff also believes that Rickard discriminated against her on three occasions.  First,

when plaintiff applied for her job with defendant, Rickard misplaced her job application but

had an organized stack of other applications, presumably from white applicants, on her desk.

(*Id*. at 33.)  Plaintiff completed another application, and she was hired.  (*Id*. at 38.)

Second, Rickard told plaintiff that she could not bring her children to work, but she

and other white employees were allowed to bring their children to work.   (*Id*. at 38-39.)

Plaintiff, however, never attempted to bring a child to work, nor does she know of any

African-American employee who was reprimanded or disciplined for bringing a child to

work.  (*Id*. at 40-41.)

Third, plaintiff testified, generally, that Rickard's failure to train her, Castle, and

Springer led to discrimination.  (*Id*. at 119.)  She said, "Sara did not train me properly.  She

didn't train [Springer] or [Castle] properly and that's why I feel like I was discriminated

against."  (*Id*.)

### 3.  Teresa Stephenson

Plaintiff believes that Stephenson's failure to promote her to Service Coordinator was

discrimination.  According to plaintiff,  Stephenson told her that she was doing a great job

with the clients and that she would be the Service Coordinator for a new group home

defendant planned to open.  (*Id*. at 41-42.)  However, during her employment, defendant had

no open positions for Service Coordinator.  (Doc. 63, Ex. 4, ¶ 6.)  Plaintiff did not apply for

a Service Coordinator position with defendant.  (*Id*. ¶¶ 5, 7.)  Defendant hired Leah Haddock,

who is white, as a Service Coordinator on January 27, 2007, about one month before plaintiff

was hired.  (*Id*. ¶ 5.)  She was the only Service Coordinator hired in the area in 2007.  (*Id*.)

Plaintiff also alleges that Stephenson and her husband, who works for the Alabama

Department of Human Resources, do not assign as many black clients as white clients to

defendant's group homes.  (Doc. 45, Ex. 1 at 44-45.)  Plaintiff has produced no evidence to

support her allegation regarding DHR's assignments.[4]

### 4. Melissa Castle & Brandy Springer

Plaintiff was involved in several incidents with Castle that she believes were

discriminatory.  First, Castle told plaintiff on her first day of work that she was "over"

plaintiff even though she only had a tenth grade education.[5]  (Doc. 45, Ex. 1 at 15 ["Ms.

---

[4]These are the only incidents of discrimination that plaintiff could recall during her
deposition, although she testified she was "pretty sure" that there were other incidents.  (Doc.
45, Ex. 1 at 45.)

[5]In her declaration, plaintiff states: "On my first day of work at VOANA, Melissa
Castle said in a demeaning tone of voice, in front of Brandy Springer and in front of my
clients, that she only had a tenth grade education, but she was over me, an 'old black
woman', and pointed at me.  Brandy Springer, in a condescending way with a sneer on her
face, smiled and nodded her head up and down in agreement . . . ."  (Doc. 67, Ex. A at 14.)
The Declaration adds that Castle "frequently told clients she only had a tenth grade education
and was 'in charge of that old black woman' – pointing at me[,]" or that "[s]ometimes,
instead of referring to me as 'that old black woman', Melissa Castle would refer to me as
'that old nigger'."  (*Id*.)  Plaintiff did not testify in her deposition that Castle referred to her

Castle told me the first day I started working there  that – this is what she said to me:  She

[said], Yolanda, I have a tenth grade education, and I am over you."];  *see also id*. at 50, 55.)

Plaintiff testified that Castle said this like plaintiff was "the slave and [she was] the master."

(*Id*. at 46.)  Plaintiff testified that Springer, her immediate supervisor, allowed this to happen.

(*Id*.)  Plaintiff admitted that Castle, who was a House Manager II at the time plaintiff was

hired, outranked her; however, she believed that Castle outranked her only because she was

white.[6]  (*Id*. at 45, 47, 52.)

        Plaintiff testified that she made it known to Castle, in Springer's presence, that she

was offended by Castle's statement by saying "something like . . . I know that I'll be . . .

promoted soon to social service coordinator or something like that . . . ."  (Doc. 45-2 at 50.)

_____

as an "old black woman" or used the "N" word; she also testified that Castle said she was
"over" plaintiff only once.  (*See* doc. 45, Ex. 1 at 15, 46-47.)  The court strikes plaintiff's
testimony in her Declaration to the extent it conflicts with her deposition testimony.  *See*
*McCormick*, 333 F.3d at 1243 n. 7.

        [6]Plaintiff testified:

                Now how are you going to tell me that you have a tenth grade education
        and that you're over me?  What is that?  Why are you over me, then?  Because
        I'm a black woman?  There's no other way that you can be over me with a
        tenth grade education and I have a degree from this great University of North
        Alabama in my home state, my birthplace.  And you have a tenth grade
        education – did not even finish high school and you're over me?  Come on.
        That's discrimination.  That's discrimination.

(Doc. 45, Ex. 1 at 51-52.)

However, she did not actually tell Springer or Castle that she was offended by Castle's comment.  (*Id.* at 50-51.)

In a separate incident involving Castle, Stephenson dropped some doughnuts off at plaintiff's group home and told plaintiff not to give any clients a doughnut until after they had taken a shower.  (Doc. 45, Ex. 1 at 56-57.)  One of the clients did not take a shower but still wanted his doughnut, and plaintiff refused to give it to him.  (*Id.* at 57.)  The client called Castle, who came to the home and gave the client a doughnut.[7]  (*Id.* at 55-60.)

Plaintiff also testified that Castle, Springer, and Rickard were present in Group Home #88 when a client, Teddy, used racial epithets towards her and that they did nothing to stop or reprimand the client.  (Doc. 45, Ex. 1 at 53-54, 127-28.)  Plaintiff believes that Springer encouraged these incidents by asking plaintiff to give Teddy a cigarette, knowing that plaintiff would refuse and then Teddy would call her race and gender specific discriminatory names.  (*Id.* at 53.)  Plaintiff felt that Teddy should not smoke cigarettes whenever he

---

[7]Plaintiff's Declaration states:

> One of the clients, a white male, refused to take a shower, but wanted his doughnut anyway.  I told him no.  The client called Melissa Castle and told Melissa Castle that "the old nigger bitch", referring to me, would not give him a doughnut.  Melissa Castle came to the residence and told me the client was to get a doughnut regardless.  With the client calling me "the old nigger bitch", Melissa Castle gave the client a doughnut without the client's taking a shower.

(Doc. 67, Ex. A at 16.)  During her deposition, she did not mention that the client used a racial and gender epithet, even after defense counsel asked her if she could think of any other information related to Castle's alleged discrimination.  (Doc. 45, Ex. 1 at 55-61.)  The court will strike this testimony from plaintiff's Declaration.  *See McCormick*, 333 F.3d at 1243 n.7.

wanted, which led to her reluctance to give him cigarettes, which caused Teddy's inappropriate behavior.  (*Id*. at 53, 130.)  According to plaintiff, Springer knew how this scenario would play out; yet, she continued to ask plaintiff to give Teddy cigarettes.  (*Id*. at 53.)  Nothing in the record indicates exactly how often this occurred; however, plaintiff indicated that these incidents were not isolated.  She testified that Springer "always wanted [plaintiff] to give one of those kids cigarettes at a certain time, certain hour[,]" (*id*.), and that Springer, Rickard, and Castle were present "a lot of times" when Teddy used offensive language, (*id*. at 128).  Plaintiff was moved to House #69 in March 30, 2007; nothing in the record indicates that Teddy followed her.

Plaintiff testified that the clients commonly said inappropriate things, and although the staff was responsible for teaching the clients how to behave, they often did not do so.  (*Id*. at 129-30.)  Plaintiff testified that she told Teddy not to talk to her in that manner, but, "It didn't do any good."  (*Id*. at 130.)

Plaintiff also alleges that Springer did not train staff properly because she did not offer sensitivity or diversity training when plaintiff suggested she do so.[8]  (*Id*. at 54-55.)

---

[8]These accusations comprise all discrimination by Springer and Castle that plaintiff could remember during her deposition.  (Doc. 45, Ex. 1 at 55, 60-61.)

### 5.  Plaintiff's Transfer to Group Home #69

Plaintiff initially worked at Group Home # 88 and Springer transferred her to Group

Home #69 on March 30, 2007.[9]  (*Id.* at 15-16, 65, 113-14; doc. 67, Ex. A at 28.)  Springer

told plaintiff that she was "good with these kids" and that "[t]hey needed someone like [her]

to lead and guide them."  (Doc. 45, Ex. 1 at 114-15.)  Plaintiff did not object to the transfer.

(*Id.* at 114.)  In an email written after plaintiff had been terminated, Stephenson stated that

plaintiff had been transferred because of complaints from her co-workers at Group Home

#88.  (Doc. 67, Ex. -7.)  In Stephenson's words, "The complaints were that she would make

statements about running the facility the right way and she refused to eat off the plates the

clients used."  (*Id.*)

Plaintiff worked with Annette Faulkner in Group Home #69, although they did not

speak much and Faulkner mostly kept to herself.  (Doc. 45, Ex. 1 at 81-83.)  However,

plaintiff testified that Faulkner gave her "evil looks." (*Id.* at 82.)

### 6.  Plaintiff's Termination

On April 12 or 13, 2007, Randy Cole, another House Manager, went to plaintiff's

home and told her, "Brandy Springer just told me she fired you."  (*Id.* at 93-95.)  According

to plaintiff, Cole told her "that [she] was pushing [her] religion on [defendant]," and that

Springer had fired her "because [she] was pushing [her] religion on [the] kids." (*Id.* at 150,

---

[9]Plaintiff worked at other group homes during her employment on an as-needed basis.
(Doc. 45, Ex. 1 at 113-14.)

196.)  Tucker sent plaintiff a letter informing her of her termination.  (*Id.*, ex. C.)  This letter

stated:

> Volunteers of America North Alabama, Inc., reserves the right under Alabama
> law and [its] Employee Handbook (effective date March, 2006) to terminate
> your employment at will.  [Its] Handbook states that as "you have been hired
> by the agency, and just as you may voluntarily leave at any time, your
> employment may be terminated at any time."  The policy goes on to allow
> employment to be terminated by VOANA, Inc. at any time, with or without
> cause.
>
> Also, as you know, your employment with VOANA began on February 23,
> 2007, which means that you are still within your probationary period.
> VOANA at this time exercises its right to terminate your employment,
> effective April 16, 2007.
>
> [I] ask that you not return to any of the facilities operated by this agency for
> any reason.  [I] also ask that you not have further contact with any VOA client
> or employee.  Any further contact should be with the Human Resources
> Department.

(*Id.*)

After receiving Tucker's letter, plaintiff spoke to Bucklin.  (Doc. 45-3 at 98.)  She

testified that Bucklin told her she "didn't fit;"[10]  Bucklin did not say that plaintiff did not "fit"

_____

[10]Plaintiff testified, "[O]n that one day when I called her ***after I got this letter***, that
[was] when she told me that I didn't fit and that I would – and that I – I would be getting a
letter or something."  (Doc. 45, Ex. 1 at 98.)  Later in her deposition, she testified:

> Q.  The conversation in which Ms. Bucklin told you that you don't fit
> – wasn't that the conversation where you were talking about whether or not
> you had been terminated and she was telling you what she understood [to be]
> the reason . . . why you have been terminated?
>
> A.  And you know what?  I hadn't even been terminated on that date.
> I'm going to tell you why I hadn't been.  She told me I have to get a letter.

because she was a black woman.  (*Id*. at 25-26, 98.)  However, plaintiff testified that she interpreted Bucklin's statement as discriminatory; she said:

> I took it that I didn't click because most of the clique were young white women.  I'm an old black woman.  So I took it – I took it because I'm too old to be hanging out with the young girls . . . .  And I also took it that I'm an old black woman.  That's racial.  And then . . . I took it that I'm going to try to live by these policies and procedures and not be heathens like Vic Tucker, Sara, and all the rest of the people that I've named.  They're not trying to do anything right in that book they printed up, giving to other people.  I wanted to do that.  And they discriminated against me because I'm too old; I'm too black; and I love the Lord too much.

(*Id*. at 26-27.)  Plaintiff did not report Bucklin's statement to anyone who worked for defendant.[11]  (*Id*. at 31-32.)  Plaintiff testified that, during this conversation, she told Bucklin that she was being discriminated against and harassed.  (*Id*. at 156.)

Defendant contends that it terminated plaintiff based on two reports regarding plaintiff's work performance.  (*See* doc. 45, Ex. 2 ¶ 8.)  According to Bucklin:

> The decision to discharge Ms. Faulk was made after Human Resources and Vic Tucker, the CEO, received reports that Ms. Faulk left her clients unattended at a concert around April 7, 2007, and because of complaints [made] around April 13, 2007 that Ms. Faulk: (1) told a client that he would

---

(*Id*. at 154-55.)  The court assumes that plaintiff talked with Bucklin after she received Tucker's letter.  Nevertheless, whether she talked with Bucklin before or after she received Tucker's letter is irrelevant to the court's decision on defendant's Motion for Summary Judgment because the record is undisputed that Bucklin made her "fit" comment and plaintiff complained to her about discrimination after defendant had decided to terminate plaintiff.

[11]Bucklin's comment is the only statement she made or action she took that plaintiff believes was unlawful discrimination or harassment.  (Doc. 45, Ex. 1 at 27-28.)

go to hell because he is gay; (2) told a client not to hug her; and (3) refused to eat with the clients.

(Doc. 63, Ex. 5 ¶ 4.)[12]

Plaintiff denies that the reported incidents occurred.   (Doc. 45, Ex. 1 at 139, 141-42; doc. 67, Ex. A at 36-37, 42.)  Moreover, her employment record contains no evidence of prior warnings or reprimands for misconduct.  (*See* doc. 67, Ex. A, ex. 22.)  However, plaintiff was still in her probationary period at the time of her termination.[13]  (Doc. 63, Ex. 5 ¶ 4.)  Bolden testified:

> At the time Ms. Faulk was discharged, it was Volunteers' policy that a decision to terminate an employee for performance reasons during the employee's probationary period was officially labeled as termination "without cause."  As a result, Faulk's discharge, even though it did not occur until after the above complaints were made, was made "without cause."  Even though the

---

[12]Plaintiff argues that Bucklin and Bolden's Affidavits, (doc. 45, Exs. 2-3; doc. 63, Exs. 4-5), should be stricken because they do not have attached copies of the "reports," (doc. 67 at 42).  Although Bucklin and Bolden characterize the complaints they received as "reports," (*see* doc. 45, Ex. 2 ¶ 8; *id.*, Ex. 3 ¶ 4), it appears they received only oral reports of complaints.  Plaintiff's requests to strike the Affidavits will be denied and the court will consider these Affidavits.

[13]Defendant's Personnel Policies states:

> New VOANA, INC. staff members enter a six (6) month probationary period of employment.  Periodic review sessions may be held during the probationary period.  However, employment may be terminated by VOANA, INC. at any time, with or without cause, during the probationary period or thereafter.  If the employee does not successfully complete the probationary period, [she] will be notified in writing of the termination of [her] employment.

(Doc. 45, Ex. 1, ex. B at 10.)

termination was designated "without cause," it does not mean that there was no reason for her termination.

(*Id.* ¶ 5.)

Defendant claims that plaintiff's job responsibilities were generally assumed by Annette Faulkner, who is white and was born in 1952; Virgil Payne, who was born in 1952; and Demetria Thompson, who was born in 1976.  (Doc. 63, Ex. 4, ¶ 10.)  The record is silent on the race of Payne or Thompson.  However, plaintiff claims that she saw a young, white female performing her job after she left.  (Doc. 45, Ex. 1 at 63-64, 90.)

**E.  PLAINTIFF'S EEOC CHARGE**

On May 1, 2007, plaintiff filed an EEOC Charge.  (Doc. 45, Ex. 1, ex. A.)  In her Charge, plaintiff stated, "I believe that I was discharged and discriminated against because of my race, Black, my age, 49, and my religious convictions in violation of Title VII of the Civil Rights Act of 1964, as amended[,] and the Age Discrimination in Employment Act." (*Id.*)  Plaintiff did not indicate that defendant had retaliated against her.  (*Id.*)  Plaintiff received a Right-to-Sue Letter from the EEOC on January 9, 2008.  (Doc. 1 ¶ 8 and Ex. B.)

**F.  PLAINTIFF'S COMPLAINT**

Plaintiff filed her Complaint against defendant on April 7, 2008, alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; the Age Discrimination in Employment Act, 29 U.S.C. § 623; and age discrimination and negligent and/or wanton training, supervision, and retention in violation of Alabama law.  (Docs. 1 & 11.)

18

In her Complaint, plaintiff alleges that defendant discriminated against her on the basis of her race, age, and religion; that it unlawfully retaliated against her for engaging in protected activity; and that it negligently and/or wantonly hired, trained, supervised and retained several of her supervisors.  (*See* docs. 1, 11.)  Although plaintiff initially expressed a desire to seek damages equal to "all the money" defendant possessed,[14] her Complaint

---

[14]Plaintiff testified:

Q:  Ms. Faulk, are you asking for the judge or jury in this case to award you money damages against Volunteers?

A:  Yes, I am.

Q:  Do you have an idea in your mind as to how much money it is you want to be awarded?

A:  All of it.

Q:  What do you mean all of it?

A:  All of it.

Q:  What do you mean?

A:  All the money.

Q:  All the money that Volunteers has?

A:  Yeah.  They needs to be shut down for real and start all over new. New staff, new group, new people that's working for them.

Q:  So whatever money Volunteers has, you want it?

A:  Yes.

19

requests only those damages ordinarily sought in employment discrimination cases, including compensatory damages, back pay, and her attorney's fees and costs.  (Doc. 1 at 8, 11, 16.)

## III.  DISCUSSION

Plaintiff's Complaint contains the following claims:  Count I – race discrimination and retaliation with regard to harassment, discipline, suspension, and termination in violation of Title VII; Count II – age discrimination with regard to her termination in violation of the federal Age Discrimination in Employment Act [ADEA] and Alabama law;[15] and Count III – religious discrimination with regard to failure to accommodate and termination in violation of Title VII.  (*See generally* doc. 1.)  Also she alleged a "State Law Pendent Claim" for "Negligent and/or Wanton Hiring, Training, Supervision, and Retention."  (*See* doc. 1 at 17-19; doc. 11.)

## A.  MOTION FOR SUMMARY JUDGMENT (Doc. 41)

Defendant filed a Motion for Summary Judgment, (doc. 41), and, thereafter, with leave of the court, filed an Amended Motion for Summary Judgment, (doc. 61).  As the

---

(Doc. 45, Ex. 1 at 157-58.)

[15]"The standards governing AADEA [Alabama Age Discrimination in Employment Act] cases are identical to those established for it[s] federal counterpart, the ADEA.  . . . [T]he same analytical framework that applies to the federal [ADEA] applies to Plaintiff's claim under the AADEA."  *Wigley v. R&D Maintenance Services, Inc.*, Civil Action No. 08-00535-KD-C, 2009 WL 2222706, *6-*7 (S.D. Ala. July 22, 2009)(internal citation omitted).

20

Amended Motion for Summary Judgment replaces defendant's original Motion for Summary Judgement, that Motion, (doc. 41), will be denied as moot.

## B. RETALIATION

### 1. EEOC Charge

Plaintiff alleges defendant harassed and terminated her "in retaliation for her engaging in activity protected by Title VII."  (Doc. 1 at 4.) She filed her EEOC Charge **after** her termination, (*see* doc. 1, Ex. A); therefore, any alleged retaliation must have occurred **before** plaintiff filed her EEOC Charge.  "If . . . the alleged retaliatory action occurs **before** the initial EEOC charge is filed, a plaintiff must exhaust [her] administrative remedies as to that claim by including factual information in the charge that discloses the factual basis for the retaliation claim."  *Houston v. Army Fleet Services, L.L.C.*, 509 F. Supp. 2d 1033, 1043 (M.D. Ala. 2007)(citing *Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277 (11th Cir. 2004); *Miller v. Southwestern Bell Tel. Co.*, 51 Fed. Appx. 928, 2002 WL 31415083 at *6-*8 (5th Cir. 2002); *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 547 (6th Cir. 1991); *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544-45 & n.2 (7th Cir. 1988), *cert. denied*, 491 U.S. 907 (1989))(emphasis in original); *see also Williamson v. International Paper Co.*, 85 F. Supp. 2d 1184, 1196-97 (S.D. Ala. 2000).  Nothing in the EEOC Charge indicates that plaintiff complained of retaliation to the EEOC.  Therefore, plaintiff's retaliation claim should be dismissed.

21

Nevertheless, "[t]he timely filing of an EEOC charge is not a jurisdictional prerequisite to bringing a Title VII suit in federal court and thus is subject to waiver and estoppel." *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1103 n.32 (11th Cir. 1996)(citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1981)).  Because defendant did not move to dismiss plaintiff's retaliation claim on this ground, the court finds that defendant has waived this defect.

### 2.  Prima Facie Case

 "Title VII's anti-retaliation provision forbids actions by an employer that 'discriminate against' an employee because she has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)(citing 42 U.S.C. § 2000e-3(a)).  To establish a prima facie case of retaliation under this provision, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action; and (3) the adverse employment action was "causally related" to her protected activity.  *Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004)(citing *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997); *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999).

### a.  Protected Activity

Plaintiff alleges that she complained to Bucklin about discrimination when she called her after Cole told her she had been fired.  (Doc. 45, Ex. 1 at 98, 152, 156.)  Plaintiff also

alleges that she complained about discrimination on a number of occasions to Bucklin, Castle, Springer and Rickard.  (*See* doc. 67 at 14 [citing, generally, to "Faulk's responses to Parts I and III and Exs. A-G"], 38-40 .)  Defendant contends:

> Bucklin and Cordia Bolden . . . both testified that Faulk never complained to them about discrimination or harassment.  (*See Exhibit 4*, ¶ 8; *Exhibit 5*, ¶ 6).  Nevertheless, Faulk claims that she told Bucklin that she was discriminated against and/or harassed during the telephone call in which Bucklin allegedly told Faulk that she was fired because she "didn't fit."  (*See Exhibit 1*, pp. 152, 156).  Faulk testified that this conversation occurred the same day she was told by a co-employee that she had been fired.  (*See id*., pp. 98, 156).  Faulk testified that this was "the only time [Bucklin] would speak to her.  (*Id*., p. 98).

(Doc. 62 at 9 ¶ 34.)

The court's Exhibit A to the Scheduling Order requires the non-moving party to admit or dispute the moving party's Statement of Facts.  (Doc. 9, Ex. A at 4.)  Specifically, "Any statements of fact that are disputed by the non-moving party ***must*** be followed by a ***specific*** reference to those portions of the evidentiary record upon which the dispute is based."  (*Id*. [emphasis added].)  "All material facts set forth in the statement required of the moving party ***will be deemed to be admitted*** for summary judgment purposes unless controverted by the response of the party opposing summary judgment."  (*Id*. [original emphasis deleted; emphasis added].)

In response to paragraph 34 of defendant's Statement of Facts, plaintiff stated, "Denied.  See Faulk's responses to Parts I and III and Exs. A-G."  This is not a "specific" citation to the evidentiary record.  Plaintiff goes on to state:

> Faulk complained to Bucklin lots of times including times she called Tucker's office and complained to Bucklin shortly after she was employed by Volunteers and before she was retaliated against on March 30, 2007[,] by being transferred to home #69 which was an even more racially discriminatory and religiously discriminatory working environment with problems.  Faulk disputes the truth of Bucklin's affidavit testimony.

(Doc. 67 at 14 ¶ 34.)  These facts, to which plaintiff has not provided a specific citation, come from plaintiff's Declaration.  Also, her assertion that she complained to anyone other than Bucklin, or that she complained to Bucklin prior to calling her about her termination, is contradicted by plaintiff's deposition testimony, and plaintiff does not explain this contradiction.  The court will not consider plaintiff's Declaration to the extent it conflicts with her deposition testimony.

For purposes of deciding whether plaintiff's retaliation claim should be dismissed, the court finds that plaintiff only complained to Bucklin and that she only complained after Cole had told her she was terminated.

### b.  Adverse Employment Action

Plaintiff argues that defendant retaliated against her by transferring her to Home #69 and by terminating her.  As set forth above, the court finds that plaintiff did not engage in any protected activity before her transfer; therefore, the only alleged adverse action for the court's consideration is her termination.  Termination is an adverse employment action.

### c.  Causal Connection

Defendant contends, "[B]ecause Faulk engaged in the alleged protected activity *after* the alleged adverse employment action occurred, there is no causal link between the two.

Thus, her retaliation claim fails." (Doc. 62 at 30-31.) The Supreme Court has held, "Employers need not suspend previously planned [employment decisions] upon discovering that a Title VII suit has been filed [or other protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Thus, there can be no causal connection between plaintiff's alleged protected conduct and her termination because defendant had decided to terminate her before she complained of discrimination.

Defendant's Amended Motion for Summary Judgment is due to be granted and this claim will be dismissed.

## B. DISPARATE TREATMENT

Plaintiff has alleged that defendant discriminated against her on the basis of her race, age, and religion; she "bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008)(internal quotations and citation omitted). Plaintiff may carry her burden by presenting either direct or circumstantial evidence of discrimination. *Id*. "Direct evidence is evidence, that, if believed, proves the existence of a fact without inference or presumption." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)(internal quotations and citations omitted). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence."

*Id.* (quotation omitted). "[S]tatements that are open to more than one interpretation do not constitute direct evidence of racial discrimination." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998). If a statement suggests, but does not prove, a discriminatory motive, it may be considered circumstantial evidence of discrimination. *Wilson*, 376 F.3d at 1086. The court notes that there is no direct evidence of discrimination in this case.

Absent direct evidence, a plaintiff may rely upon circumstantial evidence to prove discriminatory intent under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973).

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases. First, the plaintiff must establish a prima facie case of discrimination. . . . The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens--disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional

26

discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000)(internal citations and quotations omitted).

### 1. Promotion

Defendant contends that plaintiff's claims based on its failure to promote her to Service Coordinator are due to be dismissed because no Service Coordinator position was available during her tenure.

> In order to establish a prima facie case on the basis of a failure to promote, Plaintiff must demonstrate that [(i)] she belonged to a protected class; (ii) she was qualified for and applied for a position; (iii) despite qualifications, she was rejected; and (iv) the position was filled with an individual outside the protected class.

*Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007)(citing *McDonnell Douglas Corp.*, 411 U.S. at 802; *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005)).

Plaintiff has failed to submit sufficient evidence to allow a reasonable jury to find that defendant filled a Service Coordinator position for which plaintiff had applied. Therefore, the court finds that plaintiff cannot establish a prima facie case of discrimination with regard to her promotion claims.

Therefore, defendant's Amended Motion for Summary Judgment as to plaintiff's promotion claims is due to be granted and such claims will be dismissed.

### 2. Termination

Defendant contends that plaintiff's termination claims are due to be dismissed because she cannot establish a prima facie case of discrimination and/or she cannot show that its articulated reason for her discharge is unworthy of credence.

### a.  Prima Facie Case

"To establish a prima facie case of discriminatory discharge, the plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class." *Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004)(citing *Reeves*, 530 U.S. at 142).  Plaintiff may also prove a prima facie case of discriminatory discharge by proving "[she] is a member of a protected class, that [she] was qualified for the job from which [she] was fired, and 'that the misconduct for which [she] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained'."  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984)(quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982) and citing *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282-84 (1976).

Defendant argues, "[Plaintiff] presents no evidence, nor does she even allege, that she was treated less favorably than a similarly-situated person outside of her protected class. Since no other evidence of discrimination is present, [defendant] is entitled to summary judgment." (Doc. 62 at 17.)  Plaintiff argues in response that she had seen the younger white

person who replaced her out in the community with the same clients she had worked with. (Doc. 67 at 11-12 [citing doc. 45, Ex A at 63.)  She admits that she does not know the woman's identify.  (*Id*. at 13.)

Defendant contends that "[plaintiff's] job responsibilities were generally assumed by Annette Faulkner (who was born in 1952), Virgil Payne ([who] was also born in 1952) and Demetria Thompson (who was born in 1976)."  (Doc. 63, Ex. 4 ¶ 11.)  It has not elaborated on the race or religious beliefs of these three individuals, although the record shows that Faulkner is white.  The court finds, for purposes of summary judgment only, that plaintiff was replaced by the younger, white person she saw "in the community."  However, plaintiff has made no effort to establish the religion of her replacement or to show that others, who were outside her protected religious class, were treated more favorably.

The court finds that plaintiff has established a prima facie case of age and race discrimination with regard to her termination. However, she has failed to establish a prima facie case of religious discrimination with regard to her termination and as such her claim will be dismissed.

### b. Pretext

"A plaintiff may show pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Defendant asserts that Tucker and the Human

29

Resources employees decided to terminate plaintiff after they received reports that plaintiff had left her clients unattended at a concert, had told a client he was going to hell because he was gay, told a client not to hug her, and refused to eat with the clients.  (*See* doc. 62 at 19.) Complaints regarding plaintiff's mistreatment of her clients is a reason that would motivate a reasonable employer to terminate an employee.  Therefore, the court's inquiry on the issue of pretext is "highly focused" – "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537-38 (11th Cir. 1997)(citing  *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also  Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.")(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)).

"To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision."  *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J, concurring)(citations omitted);

*see Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997)(Evidence of a pretextual explanation can be established by showing "that the employer's proffered reasons are (1) factually baseless, (2) not the actual motivation for the [employment decision]; or (3) insufficient to motivate the [employment decision].").  The Eleventh Circuit has "repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law."  *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)(citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  The court is "not in the business of adjudging whether employment decisions are prudent or fair.  Instead, [its] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  *Id.* (citing *Nix*, 738 F.2d at 1187).

In her Brief in Opposition to defendant's Motion for Summary Judgment, plaintiff argues the following evidence to rebut defendant's articulated reason for her termination:

> First, [plaintiff] learned she was being fired for "pushing her religion". Next, [she] was told she was fired because she "did not fit" and was too old. [Defendant's] April 16, 2007[,] letter of termination to [plaintiff] does not state any reasons or causes for [defendant] terminating [plaintiff].  Finally, [plaintiff] learned months later that reports and complaints, dated May 14, 2007, almost a month after she was fired and almost two weeks after she filed her Charge with the EEOC, claimed that she had been fired for reasons and causes she had never heard of and for which she never received a verbal and/or a written reprimand.

> Second, there is an abundance of evidence that Stephenson would fabricate, and has fabricated, statements and records about black employees which she would then use against black employees when she wanted to take an adverse employment action against them, such as demotion, placing the employee on administrative leave without pay, and termination. . . . There is an abundance of evidence that Stephenson and her immediate supervisory staff

31

would have [defendant's] employees falsify clients' medical records and other documents.   Stephenson's reputation for telling the truth is not good. Stephenson cannot be believed.

The statements given by Stephenson and Faulkner are dated May 14, 2007, a number of weeks after [plaintiff] was terminated on April 16, 2007, and approximately two weeks after [she] filed her Charge with the EEOC.

[Plaintiff's] personnel file . . . is devoid of any reprimands – written or verbal.  [Plaintiff] denies each and every one of the pretextual reasons being given by [defendant] now and in the past for terminating her and denies that any of those things ever happened.  Those reasons are not the truth and are exactly that – pretext. [Plaintiff] submits to this Court that Stephenson's May 14, 2007[,] e-mail to Bucklin . . . and Faulkner's May 14, 2007[,] written statements were fabricated and are examples of Stephenson's pattern, practice, and habit of falsifying, or having falsified, negative statements about black employees she wanted to get rid of.

(Doc. 67 at 43-44.)

### i.  Cole's Report that Plaintiff was Terminated for "Pushing her Religion"

Plaintiff testified that Cole, who was not a decision-maker, told her that Brandy Springer, who also was not the decision-maker, had terminated for pushing her religion.[16] This statement does not address, head-on, defendant assertion's that Tucker, Bolden, and Bucklin decided to terminate plaintiff after receiving reports of misconduct related to the clients.

### ii.  "Didn't Fit" and "Too Old"

---

[16]Plaintiff contradicts herself in her deposition.  At one point she testified that Cole had said she was pushing her religion on defendant; later, she testified that Cole had told her that Springer had stated that she was fired for pushing her religion.  (*Compare* doc. 45, Ex. 1 at 150 *with id*. at 196.)

32

Plaintiff testified that Bucklin told her she did not fit; this statement does not contradict in any way defendant's articulated reason for terminating plaintiff.  Moreover, plaintiff never testified in her deposition that Bucklin told her she was fired because she was too old.  (*See* doc. 45, Ex. 1 at 152.)  This statement does not demonstrate that defendant's articulated reason is unworthy of credence.

### iii.   Termination letter did not state a reason for plaintiff's termination

The court finds no reason to infer from the facts that defendant has lied about its reasons for terminating the plaintiff.  *See Beaver v. Rayonier, Inc.*, 200 F.3d 723, 729 n.2 (11th Cir. 1999)("What matters is whether there is evidence that the employer took an impermissible factor, such as age, into account in its decision-making process, not whether the reasons for its employment decisions are reduced to writing.").  As Bolden testified, "[I]t was Volunteers' policy that a decision to terminate an employee for performance reasons during the employee's probationary period was officially labeled as termination 'without cause.'"  (Doc. 63, Ex. 4 ¶ 5.)  As she stated, "Even though the termination was designated 'without cause,' it does not mean that there was no reason for her termination."  (*Id*.)

The mere fact that the termination letter did not elaborate on the reason for plaintiff's termination is not evidence that defendant's articulated reasons for her termination are unworthy of credence.

**iv.  The written complaints from Stephenson and Faulkner about plaintiff were prepared after her termination.**

Bolden and Bucklin never testified that they relied on *written* complaints.  (*See* doc. 63, Exs. 4 ¶ 8, 5 ¶ 4.)  The court considers the written complaints submitted by plaintiff, (*see* doc. 67, Ex. A, exs. 5-7),  to be memoranda prepared to memorialize the earlier complaints for use in defense of plaintiff's EEOC charge.

The court finds the written statements of Stephenson and Faulkner, prepared after plaintiff filed her EEOC Charge, do not rebut defendant's articulated reasons for plaintiff's discharge.

**v.  Stephenson and others falsified clients' medical records and other documents; Stephenson lied about black employees when she wanted to take an adverse employment action against them; and plaintiff did not commit the work rule violations on which Bolden and Bucklin claim to have relied.**

"[W]hether or not a plaintiff actually committed the work rule violations is immaterial on the issue of pretext.  Rather, what is material is whether or not the employer believed the allegations to be true, not whether they were in fact true."  *Sweeney v. Alabama Alcoholic Beverage Control Bd.*, 117 F. Supp. 2d 1266, 1272-73 (M.D. Ala. 2000)(citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  Plaintiff has presented declaration testimony from former employees that Stephenson discriminated against black employees and that she fabricated complaints about their work.  However, plaintiff has not presented evidence that Bolden, Bucklin, and Tucker knew or believed the complaints about plaintiff they considered in deciding to terminate her were false.  Without evidence that the

34

decision-makers knew or believed the reports of plaintiff's misconduct were false, evidence that the reports were actually false is immaterial.

Based on the foregoing, the court finds that plaintiff has not established that a reasonable jury could find that defendant's articulated reasons for her termination are unworthy of credence and that the real reason was her race, her age, or her religion. Therefore, defendant's Motion for Summary Judgment will be granted and plaintiff's claims based on her termination will be dismissed.

### 3. Weekend Hours

Plaintiff alleges, "Faulk has shown that Volunteers' failed to accommodate her religious beliefs and practices.  She is a devout Christian.  She initially agreed to work on weekends because she was promised she would be given a Monday to Friday job soon.  She was made to work on Easter Sunday."  (Doc. 67 at 50.)

"Title VII . . . requires an employer [to] 'make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship.'"  *Dixon v. Palm Beach County Parks and Recreation Dept.*, No. 09-10525, 2009 WL 2707539, *1 (11th Cir. Aug. 31, 2009)(unpublished)(quoting *Lake v. B.F. Goodrich Co.*, 837 F.2d 449, 450 (11th Cir. 1988)).

> To establish a prima facie case of religious discrimination based on a failure to accommodate religious beliefs, a plaintiff must present sufficient evidence to prove:  (1) [she] had a bona fide religious belief that conflicted with an employment requirement; (2) [she] informed [her] employer of [her] belief; and (3) [she] was disciplined for failing to comply with the conflicting employment requirement.

35

*Id*. (citing *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007)).  The Supreme Court has held that an employer does not discriminate on the basis of religion when it fails to accommodate the religious preference of one employee at the expense of another employee's shift or job preference.  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 80-81 (1977).[17]

The facts of this case show that plaintiff agreed to work weekends at the time she was hired and that she worked weekends until the time of her termination.  Nothing in the record

_____

[17]The Supreme Court held:

It was essential to [defendant's] business to require Saturday and Sunday work from at least a few employees even though most employees preferred those days off.  Allocating the burdens of weekend work was a matter for collective bargaining.  In considering criteria to govern this allocation, [defendant] and the union had two alternatives:  adopt a neutral system, such as seniority, a lottery, or rotating shifts; or allocate days off in accordance with the religious needs of its employees.  [Defendant] would have had to adopt the latter in order to assure [plaintiff] and others like him of getting the days off necessary for strict observance of their religion, but it could have done so only at the expense of others who had strong, but perhaps nonreligious, reasons for not working on weekends.  There were no volunteers to relieve [plaintiff] on Saturdays, and to give [plaintiff] Saturdays off, [defendant] would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath.

Title VII does not contemplate such unequal treatment.  The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities.  . . .

*Trans World Airlines, Inc.*, 432 U.S. at 80-81.

36

indicates that plaintiff ever refused to work on Sundays; therefore, she was never disciplined for failing to work on Sunday.  Because plaintiff did not suffer an adverse employment action, her religious accommodation claim is due to be dismissed.  *See Dixon*, 2009 WL 2707539, *1 (citing *Morrissette-Brown*, 506 F.3d at 1321; *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001); *Doe v. DeKalb County School Dist.*, 145 F.3d 1441, 1452 (11th Cir. 1998)).

Defendant's Amended Motion for Summary Judgment will be granted and plaintiff's claim based on [her] weekend work schedule will be dismissed.

### 4.  Hostile Work Environment

Plaintiff alleges that her work environment was hostile due to racial harassment. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is *sufficiently severe or pervasive* to *alter the conditions of the victim's employment* and create an abusive working environment, Title VII [is] violated."[18]  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998)(emphasis added).  To establish a claim for hostile or abusive working environment based on racial harassment, an employee must show:

> (1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of

---

[18]Title VII and Section 1981 claims based on hostile work environments have the same proof requirements and use the same analytical framework.  *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282-83 (11th Cir. 2002)(citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)(citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)); *see also Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1279-80 (11th Cir. 2003).

### a. Severe or Pervasive

In *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *abrogation on other grounds recognized in Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008), the Eleventh Circuit held:

> The fourth element – that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment" – is the element that tests the mettle of most [racial] harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code."

*Gupta*, 212 F.3d at 583 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

"Title VII prohibits only the type of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's employment.'"  *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000)(quoting *Oncale*, 523 U.S. at 80-81).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524 U.S. at 788.  The "conduct must be ***extreme*** to amount to a change in the terms and conditions of employment . . . ."  *Id.* (citing *Carrero v. New York City Housing*

38

*Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-50

(8th Cir, 1986))(emphasis added).

In her Brief, plaintiff alleges the following harassing conduct:

> Castle, one of [plaintiff's] supervisors, in the presence of another one of [plaintiff's] supervisors, Springer, frequently would say in the presence of clients that she (Castle) only had a tenth grade education, but she was over [plaintiff] an "old black woman" and an "old nigger". [Plaintiff] protested, but Springer did nothing about Castle's behavior, and Castle continued doing the same thing.
>
> . . .
>
> Castle, Springer, Stephenson, and Rickard would laugh in the presence of clients and would nod their heads up and down in approval when clients would call [plaintiff] a "nigger", "black nigger", "black nigger bitch", "old black bitch", "black bitch", and "old black woman".[19]
>
> Springer rewarded a white male client with cigarettes when he would call [plaintiff] "nigger", "black nigger", and, "black nigger bitch". [Plaintiff] protested giving the client cigarettes under those circumstances.

(Doc. 67 at 36-37 [footnote added].)

### i. Castle's Remark About Being Over Plaintiff

In her deposition, plaintiff testified that Castle told her she was "over" plaintiff even

though she had only a tenth grade education.  (Doc. 45, Ex. 1 at 46, 50.)  Castle made this

statement once, and she did not mention plaintiff's race.  (*See* doc. 45 at 46-47, 50-52, 60.)

Plaintiff inferred a racial connotation from this statement.  (*Id*. at 51-52 ["Now, how are you

---

[19]In her deposition, plaintiff testified these individuals nodded their heads in approval when a client named Teddy called her names.  (Doc. 45, Ex. 1 at 127.)  She did not testify that any other client called her names.

going to tell me that you have a tenth grade education and that you're over me? . . . Because I'm a black woman?  There's no other way that you can be over me . . . ."].)

In this circuit, "Although [the court] examine[s] the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute racial harassment, the statements and conduct must be of a racial nature before they are considered in determining whether the severe or pervasive requirement is met." *Robinson v. LaFarge North America, Inc.*, 240 Fed. Appx. 824, 829 (11th Cir. 2007)(quoting *Gupta*, 212 F.3d at 583)(unpublished).  Statements that "do not relate to the race of the actor or of the offended party . . . are not counted." *Id.*

Because Castle did not mention plaintiff's race and because the statement is not reasonably interpreted to be a comment on race, the court will not consider Castle's comment to plaintiff in determining whether her work environment was hostile due to racial harassment.

### ii.  Teddy's Use of Racial Epithets

Plaintiff alleges that clients used racial epithets that were encouraged and/or approved by her co-workers and supervisors.  However, in her deposition plaintiff testified that her supervisors and co-workers only encouraged and/or approved one client's use of racial epithets. (Doc. 45, Ex. 1 at 127.)  She testified that only one client, Teddy, referred to her using the opprobrious terms and, then, only when she refused to give him a cigarette. (*Id.* at 53, 127-28, 192.)  In order to find that Teddy's racial slurs were sufficient to create a

40

hostile work environment, the court must find that slurs "created an atmosphere charged with racial hostility" because they were "so commonplace, overt and denigrating." *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995). Plaintiff has failed to present specific evidence of how many times Teddy used a racial slur. The court finds that Teddy's racial slurs are not sufficient to create a hostile working environment.

### iii.  Harassment Experienced by of Other Employees

In support of her hostile-environment claim, plaintiff filed five declarations from five former employees. (Doc. 67, Ex. C [Teresa Slatton], Ex. D [Natasha Yolanda Fuqua], Ex. E [Sonja D. King], Ex. F [Cassandra Renee Nichols], and Ex. G [Doris E. Cooper].) Plaintiff relies on these declarations to prove that "Black employees were subjected to being frequently, if not daily, called . . . racially derogatory names and slurs." (*See* doc. 67 at 35.)

Defendant has moved to strike these Declarations in part because these former employees were not disclosed by plaintiff as witnesses pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i). (Doc. 78 at 10-11.) Plaintiff has submitted the Rule 26 disclosures from lawsuits against defendant filed by King, Nichols, and Cooper. (Doc. 86, Exs. A-C.) In this submission, which does not specifically reference defendant's Motion to Strike, plaintiff states:

> On August 18, 2008[,] Faulk and Volunteers of America, North Alabama, Inc.[,] ("Volunteers") filed a joint motion to consolidate discovery in Faulk's case with discovery in King's, Cooper's, and Nichols' cases, which Judge Lynwood Smith had already consolidated. During a telephonic hearing on August 19, 2008[,] this Honorable Court granted Faulk's and Volunteers' Joint Motion To Consolidate. (Doc. 8). As was noted in the Joint Motion To

Consolidate and the August 19, 2008[,] hearing, each plaintiff is likely to be a witness in each separate case.  Natasha Fuqua was identified by King and Nichols in their initial disclosures.  Teresa Tidwell (now Slatton) was identified by King in her initial disclosures.

(*Id*. n.1.)  This court, however, did not grant the parties' Joint Motion to Consolidate; it held:

ORDER finding as *moot* 8 the Parties' Joint Motion to Consolidate.  In the motion, the parties move to consolidate this lawsuit for discovery purposes only with CV 08-S-0501-NW.  The court has orally informed the parties that discovery taken in CV 08-0501 may be used in the instant case by agreement of the parties.

(Stamped Ruling of March 6, 2009 [emphasis added].)  The court never ordered, and the parties never requested, that the Rule 26 Initial Disclosures in the other case be presumed to be the initial disclosures of the plaintiff in this case.

Rule 26(a)(1)(A)(i) of the Federal Rules of Civil Procedure provides:

Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

(i)  the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

*Id*.  "If a party fails to provide information or identify a witness as required by Rule 26(a) . . ., the party is *not allowed to use that information or witness* to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37 (c)(1).  "Rule 37(c), which is a 'self-executing sanction for failure to make a disclosure,' is 'the more effective enforcement' mechanism of the disclosure requirement

when 'the party required to make the disclosure would need the material to support its own

contentions.'" *Barron v. Federal Reserve Bank of Atlanta*, 129 Fed. Appx. 512, 519 (11th

Cir. 2005)(quoting Fed. R. Civ. P. 37, advisory committee's note (1993))(unpublished).  The

court has discretion "to sanction plaintiff[ ] for [her] failure to disclose by enforcing the

unambiguous terms of Rule 37(c)."  *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir.

2004)(citing *Firefighters' Inst. for Racial Equality ex rel. Anderson v. City of St. Louis*, 220

F.3d 898, 902 (8th Cir.2000)), *overruled on other grounds Ash v. Tyson Foods, Inc.*, 546

U.S. 454, 457 (2006).  "The burden of establishing that a failure to disclose was substantially

justified or harmless rests on the nondisclosing party."  *Mitchell v. Ford Motor Co.*, 318 Fed.

Appx. 821, 824 (11th Cir. 2009)(quoting *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D.

Ga. 2006))(unpublished).

Plaintiff has not shown that her failure to list these witnesses was harmless or

substantially justified.  Therefore, defendant's Motion to Strike will be granted.  This court

has not considered these Declarations in deciding defendant's Motion for Summary

Judgment.[20]

---

[20]However, consideration of the Declarations would not have resulted in a decision
in favor of plaintiff because there is no evidence before the court that  plaintiff was aware
of the alleged harassing conduct visited upon the declarants. *See Hudson v. Norfolk Southern
Ry. Co.*, 209 F. Supp. 2d 1301, 1326-27 (N.D. Ga. 2001)("Plaintiff may support a claim of
hostile work environment by the use of harassing conduct she learned of through hearsay, ***so
long as she was aware of the harassing incidents at the relevant time*** at which she alleges
she experienced the hostile environment.")(citing *Carter v. Chrysler Corp.*, 173 F.3d 693,
701 (8th Cir.1999); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997)).

Based on the foregoing the court finds that plaintiff has not established the alleged harassment was sufficiently severe or pervasive to alter her working conditions. Therefore, defendant's Amended Motion for Summary Judgment as to plaintiff's hostile-environment claim is due to be granted and that claim will be dismissed.

### b.  Employer Responsibility

Even if the court assumes that plaintiff can establish that her work environment was hostile due to racial harassment, defendant's Motion for Summary Judgment would still be granted because defendant is not liable for the alleged harassing conduct.

> Employers generally are liable for a supervisor's [racial] harassment if the harassment is severe and pervasive enough to result in a hostile work environment amounting to discrimination prohibited by Title VII, 42 U.S.C. § 2000e *et seq.*  There is, however, an affirmative defense, which the Supreme Court wrote into the law in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L. Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. ED.2d 633 (1998).  The defense has two halves, one of which focuses on the employer's responsibility to prevent or correct workplace harassment, and the other of which focuses on the employee's responsibility to protect herself and others from harassment by using the procedures the employer has in place to promptly report it.  To prevail under the *Faragher-Ellerth* defense, an employer must show not only that it fulfilled its responsibility, but also that the employee failed to fulfill hers.

*Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1292 (11th Cir. 2007). Generally, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  *Madray v. Public Supermarkets, Inc.*, 208 F.3d 1290, 1296 (11th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998));

44

*see also Burlington Industries v. Ellerth*, 524 U.S. 742 (1998).  However, in *Faragher*, the Supreme Court "created an affirmative defense providing employers a safe harbor from vicarious liability when the victimized employee suffered no adverse tangible employment action."[21]  *Id.*  The employer must satisfy two elements to successfully interpose the *Faragher-Ellerth* affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Id.* at 1296-97.

In the present case, defendant meets the first requirement for the *Faragher* defense by showing that it promulgated an anti-harassment policy.  (Doc. 45, Ex. 1, ex. B at 36-37.) The evidence is undisputed that defendant had an anti-harassment policy and disseminated the policy's complaint procedures.  (*See id.* at 1, 36-37.)  The anti-harassment policy provided that an employee could report racial harassment to her supervisor, the Human Resources Department, or the CEO.  (*Id.* at 36)  The Eleventh Circuit has found similar policies to be reasonable.  *See Madray*, 208 F.3d at 1298-99 (policy directing employees to report sexual harassment to "the Store Manager, District Manager, or Divisional Personnel Managers," or "anyone in management" was a reasonable policy); *Coates v. Sundor Brands*,

---

[21]This affirmative defense is unavailable when the supervisor's harassment culminates in a tangible adverse employment action, such as discharge, demotion, or undesirable reassignment.  *See Faragher*, 524 U.S. at 808.  The record does not support a finding that plaintiff's termination was the result of harassment.

164 F.3d 1361, 1364 (11th Cir. 1999) (policy directing employees to report sexual harassment to their "line manager, Personnel Contact or other manager with whom they feel comfortable" was a reasonable policy).

Defendant gave plaintiff a copy of the policy when she was hired.  Plaintiff did not complain of harassment until she spoke with Bucklin after Cole had told her she was fired. She did not return to work after she spoke with Bucklin; she was not harassed after she complained.

The second requirement for the *Faragher* defense is met because plaintiff failed to fulfill her obligation of reasonable care to avoid the harm created by the alleged harassment. "Once an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." *Madray*, 280 F.3d at 1300 (internal citations and quotation marks omitted).  "While proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 807-08.  If plaintiff was, as she alleges, subjected to a racially hostile work environment over a period of time, she was required to use defendant's reporting procedures.  Plaintiff did not utilize defendant's procedures for reporting racial

harassment until she called Bucklin after Cole told her she had been fired.[22]  This behavior

was not a reasonable delay.  Therefore, the court finds that defendant has established the

second requirement of the *Faragher* defense.

Based on the foregoing, the court finds that plaintiff's hostile environment claim is

due to be dismissed.

**5.  Other Acts**

Throughout her deposition, plaintiff alleged a number of incidents which she

considered to be discrimination:  (1) failure to drug test plaintiff; (2) not allowing plaintiff

to bring children to work, and Rickard losing her first application.  These acts are not

actionable adverse employment actions.

> The non-discrimination provisions of Title VII require a plaintiff to
> show a change in the "compensation, terms, conditions, or privileges of [her]
> employment" in order to prevail. 42 U.S.C. § 2000e-2(a)(1).  Courts use the
> phrase "adverse employment action" as a shorthand for that statutory language.
> *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232 (11th Cir. 2001), is our
> leading case defining "adverse employment action":
>
> > [T]o prove adverse employment action in a case under Title VII's
> > anti-discrimination clause, an employee must show a *serious and
> > material change in the terms, conditions, or privileges of employment*.
> > Moreover, the employee's subjective view of the significance and
> > adversity of the employer's action is not controlling; the employment

---

[22]Plaintiff testified in her deposition that she made "several attempts" to tell Tucker
about the harassment, but she never talked to him and she cannot remember leaving him any
message that she was being harassed.  (Doc. 45, Ex. 1 at 20-23, 151-53.)  She also testified
that she first told Bucklin about the harassment when Bucklin told plaintiff she did not fit,
although she had spoken with Bucklin on a number of occasions before this call.  (*Id*. at 152.)

> action must be materially adverse as viewed by a reasonable person in
> the circumstances.

*Id*. at 1239-40 (internal citations, brackets, and quotation marks omitted)
(additional emphasis added).

*Butler v. Alabama Dept. of Transp*., 536 F.3d 1209, 1215 (11th Cir. 2008).

No reasonable person would consider any of these acts "materially adverse" to their

employment.  To the extent plaintiff's Complaint alleges a cause of action based on these

incidents, such claims are due to be dismissed.

## C.  NEGLIGENT AND/OR WANTON HIRING, TRAINING, SUPERVISION, AND RETENTION

In Alabama, the elements of negligent supervision are as follows:

> In the master and servant relationship, the master is held responsible for his
> servant's incompetency when notice or knowledge, either actual or presumed,
> of such unfitness has been brought to him.   Liability depends upon its being
> established by affirmative proof that such incompetency was actually known
> by the master or that, had he exercised due and proper diligence, he would
> have learned that which would charge him in the law with such knowledge.
> It is incumbent on the party charging negligence to show it by proper evidence.

*Lane v. Central Bank*, 425 So. 2d 1098, 1100 (Ala. 1983).  "To carry this burden, the plaintiff

may show either that he informed the employer about specific misdeeds of the employee, or

that the employee's misdeeds were of such nature, character, and frequency that the master,

in the exercise of due care, must have had them brought to his notice."  *Armstrong Bus.

Servs. v. AmSouth Bank*, 817 So.2d 665, 683 (Ala. 2001).  "[N]egligence is not synonymous

with incompetency, and a single instance of negligence will not prove an employee

incompetent, nor will it impute knowledge to his employer of incompetency." *Collins v. Wilkerson*, 679 So. 2d 1100, 1103 (Ala. Civ. App. 1996).

The standard for wanton hiring, training, supervision and retention claim is even stricter: "In addition to requiring proof that an employer knows or should know that an employee is incompetent, a claim of wanton supervision carries the additional requirement that the plaintiff demonstrate that the employer has 'wantonly disregard[ed] its agent's incompetence.'" *Gardner v. State Farm Mut. Auto. Ins. Co.*, 842 So. 2d 1, 10-11 (Ala. Civ. App. 2002) (quoting *Armstrong Bus. Servs.*, 817 So. 2d at 679-80).

Plaintiff alleges that Stephenson, Castle, Springer, and Rickard were negligently and/or wantonly hired, trained, supervised and/or retained.  (Doc. 1 at 19; doc. 11 at 1-4.) Plaintiff admits, however, that she has no knowledge of what training Stephenson, Castle, or Springer received.  (Doc. 45, Ex. 1 at 143-46.)  Moreover, Bucklin and Bolden both testified that they "have not observed or been made aware of any wrongful or unlawful misdeeds" of Stephenson, Springer, Castle, or Rickard.  (Doc. 63, Ex. 4 ¶ 12; *id.*, Ex. 5 ¶ 7.) According to Bucklin and Bolden, nobody has ever complained to them that Stephenson, Rickard, Castle, or Springer discriminated against someone or harassed someone because of their race, age, and/or religion.[23]  (*Id.*, Ex. 4 ¶ 11; *id.*, Ex. 5, ¶ 6.)   Plaintiff fails to present

---

[23]For her part, plaintiff contends that the Declarations of five ex-employees of defendant, (Doc. 67, Exs. C-G), directly contradict Bolden and Bucklin's affidavits and that they, along with Tucker, have received numerous complaints of discriminatory conduct. However, the court has not considered these Declarations.

any evidence that she informed any employee of defendant about "specific misdeeds" of Stephenson, Rickard, Castle or Springer. *Armstrong Bus. Servs.*, 817 So.2d at 683. She admittedly has no knowledge of what training Stephenson, Castle, and Springer received. (Doc. 45-4, pp. 143-46.) Likewise, plaintiff has not presented evidence, nor does she even allege, that Stephenson's, Rickard's, Castle's, and Springer's alleged misdeeds were of such nature, character, and frequency that defendant, in the exercise of due care, must have had them brought to its notice. *See id.* Finally, plaintiff has not presented evidence that defendant wantonly disregarded any alleged incompetency of Stephenson, Rickard, Castle and Springer. *Gardner*, 842 So. 2d at 10-11.

Based on the foregoing, defendant's Motion for Summary Judgment is due to be granted and plaintiff's claim of negligent and/or wanton hiring, training, supervision, and retention will be dismissed.

## CONCLUSION

For the reasons stated above, defendant's Motion for Summary Judgment is due to be denied as moot, its Amended Motion for Summary Judgment is due to be granted, and its Motion to Strike is due to be granted in part and denied in part.  An Order conforming with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this the 30th day of September, 2009.


*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE